**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re | ) |
| | ) |
| | ) Case No. 24-90531 (CML) |
| *Light S.A. - Em Recuperação Judicial*,[1] | ) |
| | ) |
| Debtor in a Foreign Proceeding. | ) Chapter 15 |
| | ) |

**DECLARATION OF LUIZ ROBERTO AYOUB PURSUANT TO
28 U.S.C. § 1746 IN SUPPORT OF THE PETITIONER'S VERIFIED PETITION
FOR RECOGNITION OF THE BRAZILIAN PROCEEDING AND MOTION FOR
ORDER GRANTING FULL FORCE AND EFFECT TO BRAZILIAN RJ PLAN AND
RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 105, 1145(a), 1507(a), 1509(b), 1515,
<u>1517, 1520 AND 1521</u>**

I, Luiz Roberto Ayoub, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of

perjury under the laws of the United States that the following is true and correct:

1.      I submit this declaration (the "**Declaration**") in support of the *Petitioner's*

*Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting*

*Full Force and Effect to Brazilian RJ Plan and Related Relief Pursuant to 11 U.S.C. §§ 105,*

*1145(a), 1507(a), 1509(b), 1515, 1517, 1520 and 1521* [ECF No. 2] (the "**Recognition**

**Motion**"),[2] filed contemporaneously herewith, which seeks entry of an order: (i) granting the

Petition in this chapter 15 case and recognizing the Brazilian RJ Proceeding as the "foreign

main proceeding" for Light S.A. - Em Recuperação Judicial ("**Light**" or the "**Chapter 15**

**Debtor**") pursuant to section 1517 of the Bankruptcy Code; (ii) finding that the Petitioner is

the duly appointed "foreign representative" of the Chapter 15 Debtor within the meaning of

section 101(24) of the Bankruptcy Code and is authorized to act on behalf of the Chapter 15

Debtor; (iii) granting full force and effect to the Brazilian RJ Plan; and (iv) granting such other

---

[1]      The debtor in this chapter 15 case (the "**Brazilian Proceeding 15 Case**") and the last four digits of the tax number in the jurisdiction in which it pays taxes is Light S.A. - Em Recuperação Judicial  (01-75 – Brazil) (the "**Chapter 15 Debtor**").

[2]      Capitalized terms used but not defined herein have the meanings ascribed to them in the Recognition Motion.

and further relief as the Court deems just and proper (collectively, the "**Relief Requested**") and in support of the court-supervised judicial reorganization proceeding (the "**Brazilian Proceeding**") commenced by the Chapter 15 Debtor on May 12, 2023 pursuant to Federal Law No. 11.101 of February 9, 2005 (as modified, the "**Brazilian Bankruptcy Law**"), of the laws of the Federative Republic of Brazil ("**Brazil**"), pending before the 3rd Business Court of Rio de Janeiro (the "**Brazilian Court**").[3]

## BACKGROUND AND QUALIFICATIONS

2.      I am a partner in the law firm of Galdino, Pimenta, Takemi, Ayoub, Salgueiro, Rezende de Almeida Advogados, with offices in Brazil in the cities of São Paulo/SP, Rio de Janeiro/RJ and Brasília/DF.

3.      Pertinent aspects of my training are as follows: I hold a Bachelor's and Master's degree in Law from Universidade Estácio de Sá – UNESA, and a Doctorate in Corporate Law from Universidade Federal Fluminense – UFF.  I began my career as a Judge at the Court of Justice of Rio de Janeiro (TJRJ) and retired as an Appellate Judge.  Additionally, I am a member of the Brazilian Bar Association, the Institute of Lawyers of Brazil, and have served on special commissions for the improvement of judicial recovery laws in Brazil.

4.      As a legal scholar, I have authored several significant publications, including "A Construção Jurisprudencial da Recuperação Judicial de Empresas" ["The Jurisprudential Construction of the Judicial Recovery of Companies"] (FGV Direito Rio and Forense Jurídica, 2016 – 3rd edition), "Arbitragem e a Efetividade do Processo – Uma Nova Proposta" ["Arbitration and the Effectiveness of the Process – A New Proposal"] (Editora Lumen Juris, 2005), and contributed to "Coletânea – Reflexões Sobre o Novo Código de Processo Civil" ["Collection – Reflections on the New Code of Civil Procedure"] (Editora FGV – 1st edition,

---

[3]      The case number for the Brazilian RJ Proceeding before the Brazilian RJ Court is 0843430-58.2023.8.19.0001.

2016).  My scholarly work has also been featured in the International Journal of Insolvency Law and Revista Justiça e Cidadania.

     5.     As an attorney, I have been the lead counsel and have participated in several successful out-of-court restructuring operations as well as court-supervised reorganization proceedings in the last 5 years.  Examples of such reorganization proceedings, among many others, are as follows:

        1.     Universidade Candido Mendes,[4] a 118-year-old educational institution, which was the first judicial reorganization of a non-profit civil association in Brazil. Its debts exceeded R$400 million;

        2.     Educação Metodista,[5] an educational association serving the entire country, whose judicial protection temporarily safeguarded the assets of the Methodist Church. Its debts exceeded R$630 million; and

        3.     Light S.A. - Em Recuperação Judicial,[6] the judicial reorganization of the energy holding company that controls the other companies in the Group, particularly Light Serviços de Eletricidade S.A. and Light Energia S.A., with liabilities of approximately R$11 billion.

     6.     To assist this Court in its consideration of the Recognition Motion, I submit this Declaration describing the relevant features of court-supervised reorganization proceedings available under the Brazilian Bankruptcy Law and preliminary injunction proceedings in preparation for the commencement of a restructuring under the Brazilian Bankruptcy Law and other applicable laws, as well as certain actions taken to date in connection with the Brazilian Proceeding.

     7.     The facts and matters contained in this Declaration are true and correct to the best of my information, knowledge, and belief.  To the extent matters stated in this Declaration

---

[4] Tribunal de Justiça do Estado do Rio de Janeiro, Judicial Reorganization proceeding No. 0093754-90.2020.8.19.0001

[5] Tribunal de Justiça do Estado do Rio Grande do Sul, Judicial Reorganization proceeding No. 5035686-71.2021.8.21.0001

[6] Tribunal de Justiça do Estado do Rio de Janeiro, Judicial Reorganization Proceeding No. 0843430-58.2023.8.19.0001

are statements of legal opinion, such statements represent my views as a practicing Brazilian attorney.

## **BRAZILIAN REORGANIZATION PROCEEDINGS**

8.        Insolvency proceedings in Brazil are governed by the Brazilian Bankruptcy Law.[7]  The Brazilian Bankruptcy Law focuses on facilitating faster and more efficient bankruptcy processes and seeks to foster direct collaboration and participation of governmental authorities in the company's reorganization.  Moreover, the Brazilian Bankruptcy Law focuses on encouraging a company's successful reorganization, rather than its liquidation.

9.        The Brazilian Bankruptcy Law provides for two (2) forms of reorganization proceedings: (i) a court-supervised reorganization proceeding known as *recuperação judicial* (the "**Judicial Reorganization**" or "**RJ**"); and (ii) an expedited reorganization proceeding known as *recuperação extrajudicial*.  The Brazilian Bankruptcy Law also provides for a liquidation proceeding known as *falência* and, since 2020, a transnational insolvency proceeding for recognition of foreign insolvencies.  Because the Chapter 15 Debtor's Brazilian Proceeding (as defined below) is a Judicial Reorganization, only the procedures and requirements of this form of reorganization will be discussed herein.

### A.        Requirements for Commencing a Judicial Reorganization

10.        Pursuant to the Brazilian Bankruptcy Law, the Judicial Reorganization proceeding in Brazil is a judicially-supervised process whereby the debtor and its creditors work together to help the debtor to overcome its financial distress.  Only the debtor is allowed to file for Judicial Reorganization, therefore creditors are not permitted to commence an "involuntary" RJ against a debtor.  The Brazilian Bankruptcy Law allows entities within the same group under common corporate control to file a joint petition for Judicial Reorganization

---

[7]        Although Brazilian Law generally applies to insolvency proceedings, this includes civil procedural rules codified in the 2015 Brazilian Civil Procedure Code (Federal Law No. 13,105/2015), general rules for the interpretation and application of the law, such as pursuant to the Decree-Law No. 4,657/1942 as amended by Federal Law No. 12,376/2010), and other.

so that the cases for all debtors are procedurally consolidated. Moreover, if certain criteria are met, the Brazilian Bankruptcy Law also authorizes courts to substantively consolidate entities in the same group by treating them as a single economic unit (*i.e.,* the assets and obligations of related companies that have filed a joint petition are pooled together for the purposes of such proceeding).[8]

11.    An entity commences an RJ by filing an RJ petition with the appropriate state civil court (the "**Bankruptcy Court**") in the jurisdiction where the debtor maintains its principal place of business (*principal estabelecimento*). To the best of my knowledge, I understand the concept of principal place of business, as provided under Article 3 of the Brazilian Bankruptcy Law, to be largely similar to that of "center of main interests" under U.S. law.

12.    When filing the RJ petition, a debtor must include, among other things: (i) a description of the causes of its financial distress; (ii) its financial statements; (iii) a list of its creditors and claims; (iv) a list of all legal actions to which it is a party (with an estimate of the respective amounts claimed, which is not always possible immediately, considering the scope of the recovery); (v) a list of the key employees, including their respective positions and salaries, understood as those who maintain ties with the company, as well as related parties, all with the purpose of exercising greater control to prevent misappropriations or payments expressly prohibited by law; (vi) certificate of regular standing of the debtor before the Board of Trade; (vii) certificate of civil-law notaries in the judicial district of the debtor's domicile identifying any recorded default of debt obligations; (viii) statements of the debtor's bank

---

[8]    Article 18 of the Brazilian Energy Concession Law provides that the judicial reorganization proceeding cannot be applied to public electric energy services concessionaires, except after the concessionaires terminate their concession contracts. Therefore, as a public electric energy provider, the concessionaires in the Light Group (as defined herein), namely Light SESA and Light Energia S.A (each as defined herein), are not eligible to file an application to commence a Brazilian RJ Proceeding.

accounts and its financial investments; (ix) a detailed report of tax liabilities and claims and collaterals not subject to the Judicial Reorganization; and (x) other relevant information.

13.     The filing date triggers key legal effects of the Judicial Reorganization.  For example, after the filing, a debtor is barred from paying claims subject to the restructuring proceeding and can no longer dispose of or encumber its fixed assets without prior authorization of the Bankruptcy Court or as determined in the plan of reorganization approved by creditors and the Bankruptcy Court in the Judicial Reorganization.  Further, the filing date determines whether a claim against the debtor will be subject to the Judicial Reorganization, as only claims that originated prepetition are affected.

14.     Once the RJ petition has been filed, the court will review the petition and determine whether it is appropriate to admit the debtor into Judicial Reorganization.  If a debtor entity satisfies all the requirements mentioned above and certain other additional eligibility requirements, the Bankruptcy Court will issue a decision commencing the Judicial Reorganization proceeding (the "**Acceptance Order**") and appointing a judicial administrator (the "**Judicial Administrator**").   The Judicial Administrator monitors the Judicial Reorganization, provides reports on the debtor's activities, promptly provides all information requested by interested creditors, assists in the verification of claims, and complies with other mandates.  Creditors receive notice of the Acceptance Order and the debtor's list of creditors through a publication in the official gazette of the State of the Bankruptcy Court (the "**Official Gazette**").

15.     Upon entry of the Acceptance Order, all collection actions or enforcement proceedings commenced against the debtor or any jointly-liable shareholder before or after the RJ filing shall be stayed for at least 180 days (the "**RJ Stay**"), if the claims are already liquidated.  If they are not liquidated, the law provides that the amounts must be reserved.  The RJ Stay is subject to extension by court order for one (1) additional term of 180 days, provided

that the debtor has not caused the failure to comply with the initial deadline.  Accordingly, upon entry of the Acceptance Order, creditors become barred from seeking payment of their prepetition claims.  Any preferential payment on account of prepetition claims that are subject to the RJ proceeding and to the detriment of other creditors is deemed a criminal offense, and the Bankruptcy Court has authority to claw back any such payments.

16.     The Brazilian Bankruptcy Law does not expressly prohibit the extension of the RJ Stay, originally granted to a debtor under the RJ proceeding, to affiliated non-debtor entities or individuals in extraordinary circumstances.  This is particularly pertinent when the debtor is either responsible for, or jointly liable for, the financial objections or claims attributed to such non-debtor entities or individuals.  In addition to applying Brazilian Bankruptcy Law (including its more general policies and specific rules), the RJ court shall observe Brazilian Law in general, including core principles and interpretation rules, and Brazilian Civil Procedure (whenever applicable).  Such broad legal framework provides RJ courts with powers in connection with the underlying policy and scope of Brazilian Bankruptcy Law that may resemble equitable powers of a U.S. Bankruptcy Court.

17.     Under Brazilian Bankruptcy Law, entities other than those who have initiated the RJ are typically not protected by the RJ Stay.  However, there are exceptional circumstances.  In cases where a court determines that an economic group of entities functions in an integrated manner, and any disruption to the businesses within the group or actions against them would adversely affect the entity requesting RJ, the RJ court could extend the RJ Stay as a precautionary measure.  Although not explicitly provided for in Brazilian Bankruptcy Law, such measures are deemed necessary to safeguard the effectiveness of the RJ and are in accordance with the Brazilian broad legal framework.

18.     Furthermore, as part of the RJ Stay, the Bankruptcy Court has jurisdiction to protect relevant assets of the debtor not only against creditors subject to Judicial Reorganization, but also against the enforcement of RJ Exempt Claims (as defined below).

**B.     Claims Subject to Judicial Reorganization**

19.     The debtor is required to file a list of creditors together with its RJ petition, and creditors have fifteen (15) days from the publication of the Acceptance Order to file proofs of claims with the Judicial Administrator.  The Judicial Administrator is then responsible for compiling and submitting a revised list of creditors subject to the Judicial Reorganization classifying them according to their statutory priorities.  Creditors receive notice of the revised list of creditors through a publication in the Official Gazette, and then have another ten (10) days to file proofs of claims directly with the Bankruptcy Court in case of any objections to the list of creditors.  Any and all allowed claims admitted to the list of creditors before confirmation of the plan of reorganization are considered for purposes of calculating the plan approval thresholds under the Brazilian Bankruptcy Law (described in further detail below).

20.     While, as a general rule, claims existing at the date of the RJ petition (*i.e.*, prepetition claims) are subject to the Judicial Reorganization, there are certain exceptions under the Brazilian Bankruptcy Law.  In addition to post-petition claims, there are claims (collectively, the "**RJ Exempt Claims**") that are not subject to the RJ, for example: (i) taxes; (ii) claims secured by "fiduciary liens" (*i.e.*, a fiduciary assignment of contract rights (*cessão fiduciária*) or fiduciary sale of assets (*alienação fiduciária*),[9] (iii) claims deriving from leasing transactions (*arrendamento mercantil*);  (iv) claims held by an owner or committed seller of

---

[9]     A fiduciary lien is a particular type of security interest defined by Brazilian Law and, unlike regular liens that are subject to the Bankruptcy Court's authority, is explicitly exempted from restructuring under the Brazilian Bankruptcy Law. Through a fiduciary lien, the ownership of an asset is temporarily transferred to the creditor as a guarantee of an obligation, while the debtor (original owner) keeps immediate possession of such asset.  Upon the debtor's default, the creditor is entitled to immediately foreclose the asset without prior Bankruptcy Court approval and sell it to satisfy its obligation, with the remainder of the sale proceeds being directed toward the debtor.  This allows parties to negotiate for stronger collateral packages when desirable.

real estate; and (v) claims deriving from advances in export or currency exchange agreements.

21.     RJ Exempt Claims are not subject to the plan of reorganization.  Further, absent a special order of the Bankruptcy Court, creditors holding RJ Exempt Claims technically may enforce their claims against the debtor in parallel with the Judicial Reorganization notwithstanding the RJ Stay.  For the duration of the RJ Stay, however, creditors holding RJ Exempt Claims (except for holders of tax claims) may not seize or dispose of any of the debtor's hard assets that are essential to its business operations, regardless of whether such RJ Exempt Claims are secured by liens over any of those assets.  Accordingly, the Bankruptcy Court has exclusive jurisdiction to determine which assets may be attached and seized by creditors to satisfy RJ Exempt Claims while the RJ Stay is effective.

**C.     The Debtor's Operations Throughout the Judicial Reorganization**

22.     As a rule, once a Judicial Reorganization is commenced, the debtor remains in possession of its assets and continues to run its business during the course of the proceeding. Nonetheless, the assets of the debtor are also subject to the control and supervision of the Bankruptcy Court.  Indeed, once the Acceptance Order is entered, the debtor is subject to oversight by the Judicial Administrator and is prevented from disposing of hard assets without prior authority by either the Bankruptcy Court or under the terms of a confirmed plan of reorganization.  And while the Judicial Administrator is responsible for, among other things, monitoring and providing reports on the debtor's management of its day-to-day affairs, the Judicial Administrator does not interfere with the debtor's ongoing operations and business decisions.  Accordingly, the officers and directors of a debtor remain duly authorized to act on the debtor's behalf in the Judicial Reorganization, in a manner I understand to be similar to the authorities of officers, directors or authorized representatives of a debtor-in-possession under the Bankruptcy Code in the United States.  Furthermore, a debtor (or its agents) is authorized under the Brazilian Bankruptcy Law and other applicable laws to act as a foreign representative

in a foreign proceeding in support of an RJ proceeding, irrespective of whether a court order appointing such foreign representative has been obtained.[10]

23.     The Brazilian Bankruptcy Law also allows creditors to form a committee composed of up to one (1) representative from each of the determined class of creditors (as explained below).  The creditors' committee serves as an overseeing body that ensures the interests of the creditors are represented throughout the proceeding.[11]  The main responsibilities of the creditors' committee are to inspect and monitor compliance with the Brazilian Bankruptcy Law, to inform the judge of any violation of legal provisions by the debtor, to request that the judge call a General Creditors' Meeting (as defined below), and to issue opinions on proofs of claims.  In practice, creditors rarely seek the formation of a creditors' committee.

### D.     Plan of Reorganization and Confirmation Process

24.     After filing the RJ petition and following entry of an Acceptance Order, the debtor must submit a plan of reorganization within sixty (60) days of the publication of the Acceptance Order in the Official Gazette.  This 60-day period, as a general rule, is not extendable.  If a debtor does not comply with this obligation, the Judicial Reorganization may be converted into a liquidation (*falência*), unless creditors vote to allow the submission of an alternative plan, as explained below.

25.     Upon filing of a plan of reorganization by the debtor, the Brazilian Bankruptcy Law requires that notice be given to all impaired creditors and parties in interest, through a publication in the Official Gazette.  Thereafter, creditors have thirty (30) days to object to such

---

[10]   *See* Article 167-E of the Brazilian Bankruptcy Law ("The following are authorized to act in other countries, regardless of a court order, as a representative of the Brazilian proceeding, so long as such act is permitted under the law of the country in which the foreign proceedings are pending: (I) the debtor, in a judicial and extrajudicial reorganization proceeding . . . .").

[11]  The Judicial Administrator and Public Prosecutor provide additional oversight over a debtor's operations and affairs as well as their restructuring efforts and conduct in the RJ proceeding, thereby ensuring accurate information is disseminated to the creditors.

plan before the Bankruptcy Court.  Should any creditor object to the plan of reorganization proposed by the debtor, the Bankruptcy Court is required to call a general meeting of creditors (the "**General Creditors' Meeting**" or "**GCM**") to vote on the plan of reorganization.[12] Creditors receive notice of the GCM through a publication in the Official Gazette, which shall occur at least fifteen (15) days in advance of such meeting.

26.     The Bankruptcy Court, however, may analyze and approve a proposed plan of reorganization *without* requiring a GCM if certain conditions are present.  Specifically, the GCM shall not be required if the debtor is able to obtain sufficient creditor support via adhesion terms, *i.e*., a written confirmation from creditors that they support the plan of reorganization (each, an "**Adhesion Term**"), to meet the plan approval thresholds under the Brazilian Bankruptcy Law, up to five (5) days before the scheduled date of the GCM.  As a result thereof, the Bankruptcy Court will immediately cancel the GCM (if one has been scheduled) and issue a notice to all creditors of the presentation of the Adhesion Terms.  Creditors may challenge the Adhesion Terms within ten (10) days on the following grounds: (i) insufficient support to meet the legal thresholds for plan approval; (ii) nonfulfillment of procedural requirements; (iii) that the Adhesion Terms violate the law; or (iv) that the terms and conditions of the plan of reorganization are illegal.

27.     If (i) no objections to the plan are raised  by  any  creditor or (ii) the plan is approved by the requisite majority of creditors (a) at the GCM or (b) through Adhesion Terms, the Bankruptcy Court  may  confirm  the  plan  of  reorganization  and  grant  the  Judicial Reorganization of the debtor.

---

12   At the General Creditors' Meeting, the debtor and the creditors in attendance are allowed to discuss the terms of the plan of reorganization and may negotiate modifications. As described below, if these negotiations require additional time, the debtor and its creditors can agree to adjourn the General Creditors' Meeting for further continued discussions. The plan of reorganization may be submitted for voting in its modified form at the General Creditors' Meeting.

28.     Alternatively, at a GCM, the debtor and creditors representing more than a simple majority (more than fifty percent (50%)) of creditors present and voting at such meeting may agree to adjourn the meeting to allow negotiations to continue with the debtor towards a consensual plan of reorganization, as is customary in many complex RJ cases.  In such an instance, the debtor may adapt or modify a plan of reorganization to meet the creditors' expectations.  Creditors will vote on the amended plan at a later scheduled GCM.

29.     Provided certain requirements are met, creditors may also agree to propose an alternative plan, including where a debtor (i) fails to submit a plan of reorganization within the statutory period or any extensions thereof granted by the Bankruptcy Court or (ii) presents a plan of reorganization that is rejected by the majority of creditors present and voting at a GCM. In such a case, creditors may still decide on whether to permit the proposal of a competing plan formulated by creditors (an "**Alternative Plan**") that will be subject to a further vote.  If, however, creditors decide not to allow for an Alternative Plan to be proposed, or if such Alternative Plan fails to obtain sufficient support to meet the statutory approval thresholds, the court may convert the Judicial Reorganization into a liquidation proceeding.[13]

30.     A plan of reorganization must contain: (i) a thorough description of the measures to be taken to successfully reorganize the debtor's business; (ii) a demonstration of the economic feasibility of the plan of reorganization; (iii) a financial expert's valuation of the debtor's assets; and (iv) a proposed treatment of claims subject to the RJ.  In general, claims of the same class must be treated equally absent an economic justification for treating a subgroup of claims differently.

31.     For purposes of voting on a plan of reorganization, claims are divided into the following four classes: (i) labor-related claims (Class I); (ii) secured claims (Class II);

---

[13]   Once a Judicial Reorganization is converted into liquidation, the officers and directors of the debtor are no longer allowed to manage its affairs, and the assets of the debtor are collected and sold by the Judicial Administrator.

(iii) unsecured claims, claims entitled to general and special privilege, and subordinated claims (Class III); and (iv) claims held by "small business companies" (Class IV).  Debt claims owed to shareholders, subsidiaries, affiliates, and certain other parties related to the debtor may attend the GCM, but are not allowed to vote on RJ plans.  Furthermore, RJ Exempt Claims are not affected by the plan and do not entitle their holders to vote on the plan.  In addition, holders of unimpaired claims are also not entitled to vote on the plan of reorganization.  Each impaired creditor holds the right to vote on the plan unless such creditor is a partner or shareholder of the debtor company, or of a party related to the debtor company.

32.     Approval of a plan of reorganization may be obtained in one of two ways: (i) through a "regular creditor majorities" procedure; or (ii) through a "cramdown" procedure. Approval of a plan through the regular creditor majorities procedure at the GCM or through Adhesion Terms requires the plan to be approved in each class of claims.  Specifically, in Classes I and IV, the requirement for approval of the plan is a simple majority, *i.e.*, more than fifty percent (50%) of the number of creditors present and voting at the GCM, regardless of the amount of the claims held.  In Classes II and III, however, the plan must be approved by both (i) more than fifty percent (50%) of the number of creditors present and voting at the GCM in each class and (ii) creditors that hold more than fifty percent (50%) in principal amount of the allowed claims in each class present and voting at the GCM.

33.     If the required majorities are not met in a class of claims, the plan may still be approved via cramdown. Approval of a plan through cramdown requires the court to approve the plan if all of the following criteria are met:

(i)      holders of a simple majority (more than 50%) of the total allowed claims present at the GCM vote to approve the plan of reorganization;

(ii)     the required majorities are met in three (3) of the four (4) voting classes of claims (if there are four (4) voting classes of claims), or the required majorities are met in two (2) of the three (3) voting classes of claims (if there are three (3) voting classes of claims), or if the required majority is met in one (1) voting class of claims (if there are only two (2) voting classes of claims);

13

(iii)    for the creditors' class voting to reject the plan, more than one-third (1/3) of creditors present and voting at the GCM in such class vote to approve the plan (following the voting thresholds for each class set forth above); and

(iv)    the plan of reorganization does not discriminate against creditors of the class that rejected it—claims of the same class must be treated equally absent proper justification for treating a subgroup of claims differently.

34.    If a plan of reorganization has been approved by the requisite majority of creditors, the Bankruptcy Court must confirm the plan of reorganization, unless the approved plan (in whole or in part of it) violates Brazilian Law, in which case the Bankruptcy Court is afforded discretion to deem such illegal provisions void or order a revised version thereof to be submitted.  The Brazilian Bankruptcy Law provides that a judicially confirmed plan of reorganization causes a sort of novation of all affected prepetition claims and binds the debtor as well as all the impaired creditors.

35.    Brazilian Law provides for a robust appeal process after a plan of reorganization is confirmed.  Upon entry of the plan confirmation order, any dissenting creditor (including creditors that have not submitted an Adhesion Term) affected by the plan as well as the office of the public prosecutor (the "**Public Prosecutor**")' may (i) file a motion for clarification with the Bankruptcy Court within five (5) days of publication of the plan confirmation order and/or (ii) file an interlocutory appeal with the Brazilian State Court of Appeals (the "**Court of Appeals**") within fifteen (15) days of publication of the plan confirmation order (or the decision on a motion for clarification, if one is filed).  After the Court of Appeals renders its decision, the parties may appeal such decision within fifteen (15) days to the Brazilian Superior Court of Justice (the "**Superior Court of Justice**"), the highest court with jurisdiction over matters related to the Brazilian Bankruptcy Law, if the challenged issue is not a matter of fact, but any aspect related to the effectiveness of a statutory rule.

36.    Throughout the entire process, creditors and other parties in interest are given proper notice through electronic publication in the Official Gazette of every order and notice

entered by the Bankruptcy Court, the Court of Appeals, and the Superior Court of Justice. Accordingly, the deadline to file appeals against any court orders only begins after the parties have received proper notice of such order, including through the Bankruptcy Court's official website, which is available for public consultation.

### E.    Supervision Period After Plan Confirmation

37.    Under the Brazilian Bankruptcy Law, once a Bankruptcy Court confirms a plan of reorganization, the debtor may remain in Judicial Reorganization until such time as the debtor performs Plan obligations that are due up to two (2) years from the entry of the plan confirmation order, which period the Bankruptcy Court has discretion to decrease or extend (the "**Supervision Period**").   During that time, the Bankruptcy Court and the Judicial Administrator continue to monitor and supervise the debtor's performance and compliance with all obligations provided under the plan of reorganization as they become due.

38.    If, at the end of the Supervision Period, the debtor has complied with all obligations under the plan of reorganization that became due until that point, the Bankruptcy Court may issue an order formally closing the debtor's Judicial Reorganization.   By contrast, if the debtor fails to comply with any of its obligations under the plan during the Supervision Period, the Bankruptcy Court must either (i) convert the Judicial Reorganization proceeding into a liquidation, or (ii) at its discretion and absent an order closing a debtor's Judicial Reorganization proceeding, grant the debtor the opportunity to propose amendments or revisions to the plan of reorganization.

39.    During the Supervision Period, the restrictions imposed on the debtor due to the commencement of the RJ proceeding persist, such as the prohibition on the disposal of assets without prior approval from the Bankruptcy Court, except if already provided in the plan approved and  confirmed by the judge, as well as the obligation to present monthly reports on the debtor's activities and financial results.   Similarly, the Judicial Administrator continues to

supervise the operations and financial and legal affairs of the debtor for the duration of the Supervision Period and submit reports in connection therewith.  In addition, the Bankruptcy Court retains its jurisdiction over all assets of the debtor until the RJ is formally closed.

      **F.**      **Additional Aspects of the Brazilian Bankruptcy Law**

           **i.**      **Provisions for the Just Treatment of All Holders of Claims Against or Interests In the Debtor's Property**

      40.      As outlined above, the procedural safeguards for creditors of a debtor under the Brazilian Bankruptcy Law are robust, providing a comprehensive procedure for the orderly resolution of claims and the equitable distribution of assets among the estate's creditors in a single proceeding before a single court, the Bankruptcy Court.  The regular creditor majorities procedure requires significant consensus among the creditors of each class.  A majority in both number and amount of the claims voting for each class must vote to approve the plan; in the event that there is up to one (1) dissenting class, the plan may be crammed down on such class only so long as the other three (3) classes accept the plan, at least one-third (1/3) of the members of the dissenting class (pursuant to the quorum requirements outlined above) accept the plan, and the plan does not treat differently the members within a dissenting class.

      41.      The Brazilian Bankruptcy Law provides additional protection to creditors in a Judicial Reorganization through the possible appointment of a committee of creditors and a Judicial Administrator, each of which carries out an oversight role in the proceeding that ensures a fair and orderly resolution of the claims against the debtor's estate.  In addition, creditors also have the right to object to a proposed plan within thirty (30) days from its submission in the Judicial Reorganization.

      42.      Creditors may also seek reconsideration of a plan.  Within the five (5) days after the Bankruptcy Court confirms a plan, creditors may present to the court a motion for clarification; and, within fifteen (15) days of confirmation, the creditors may file an interlocutory appeal to be considered by the Court of Appeals.  Moreover, these interlocutory

appeals may be filed by creditors either after the decision on confirmation of the plan or after the decision regarding the motion for clarification. Appeals filed by the same creditor against both decisions will be considered by the Bankruptcy Court on a case-by-case basis. Finally, after the Court of Appeals issues its decision, the creditors have fifteen (15) days to file a special appeal to the Brazilian Superior Court of Justice in specific situations. Creditors are given proper notice of every court decision, and the deadlines for filing appeals count from the date on which creditors are notified, by means of publication in the Official Gazette, of each decision.

ii.     **Protection of Claim Holders in the United States against Prejudice and Inconvenience in Processing Claims**

43.     Under the Brazilian Bankruptcy Law, creditors are given adequate notice of timing and procedures for filing claims and such procedures do not impose any additional burdens for foreign creditors to file a claim. Upon accepting the debtor into Judicial Reorganization, the Bankruptcy Court orders the publication of notice of Acceptance Order and the list of creditors presented by the debtor. Creditors receive notice of the list of creditors submitted by the debtor once the Judicial Reorganization is commenced, and have the opportunity to file proofs of claims with the Judicial Administrator to include or correct their claims affected by the proceeding.

44.     Foreign creditors have the same status as local creditors in the RJ proceeding, which means that a foreign creditor is subject to the proceeding on the same terms as described herein and will have the same rights and protections under the Brazilian Bankruptcy Law and as a creditor in Brazil. All foreign creditors are entitled to be on the list of creditors. In addition, except for voting purposes, the plan of reorganization may not convert claims in a foreign currency to Brazilian *reais* without the specific consent of each affected creditor. As such, no significant burdens are placed upon U.S. creditors that are inconsistent with those placed upon domestic creditors.

iii.     **Prevention of Preferential or Fraudulent Dispositions of the Debtor's Property**

45.     Although the Brazilian Bankruptcy Law does not govern avoidance actions in Judicial Reorganization proceedings, creditors are generally permitted to bring actions to avoid transfers made by the debtor under the Brazilian Civil Code, which provides that the following actions be considered fraud against creditors: (i) a gratuitous transfer of assets that leads to or occurs during the debtor's insolvency; or (ii) any onerous transactions entered into by an insolvent debtor and a third party for fraudulent purposes, if causing damage to the creditors. In each of the above cases, the damaged creditors are entitled to file a lawsuit in a civil court to have the transaction declared void within four (4) years of the transaction.  These lawsuits will generally not be enjoined as a result of the RJ Stay applicable in a defendant's or debtor's Judicial Reorganization proceeding.

46.     If a debtor has been declared bankrupt and a liquidation proceeding has been commenced, any creditor, the Public Prosecutor, or the Judicial Administrator may bring actions to avoid transfers made to third parties with the intent to harm creditors or damage the debtor's estate.  In this case, the court may also declare such transfers void *sua sponte* unless intent to defraud is a disputed question of fact, in which case an action must be commenced by one of the parties above.

47.     Moreover, some transfers are subject to avoidance within a bankruptcy liquidation proceeding as a matter of law if they were made during the "legal term," a period set by the judge and beginning not more than ninety (90) days before the liquidation petition or the date of the first protest (official declaration of default) by a creditor, and ending on the petition date, during which such transfers by the debtor are subject to scrutiny.  Such transfers include payments of debts not yet due, payments of debts that were due but were enforceable in any way not provided for in the agreement memorializing the debt, and the creation of liens or any other *in rem* property interest in connection with a previously incurred debt.

### iv. Distribution of Proceeds of the Debtor's Property is Substantially in Accord with the Bankruptcy Code

48.     The distribution scheme within a bankruptcy liquidation proceeding prescribed in the Brazilian Bankruptcy Law grants priority to certain administrative claims and, importantly, grants secured claims priority over unsecured claims.  Under the Brazilian Bankruptcy Law, administrative claims are given super-priority over other claims, including secured claims.  Such administrative claims include: (i) fees of the Judicial Administrator and his or her assistants; (ii) labor-related claims or claims related to occupational accidents arising post-petition; (iii) any funds provided to the estate by the creditors post-petition; (iv) the costs of the bankruptcy proceedings and expenses related to the disbursement of proceeds of the estate; (v) court costs for actions brought against the estate in which the estate was defeated; (vi) other obligations arising from valid juristic acts performed during the Judicial Reorganization and taxes arising post-petition; (vii) labor-related claims of a strictly salary nature, as opposed to hourly wages, arising during the three (3) months prior to the petition date, limited to an amount equal to five (5) monthly minimum wages per salaried employee; and (viii) debtor-in-possession financing regularly provided during the RJ.

49.     Following the payment of the above-referenced administrative super-priority claims, the various classes of claims are paid, within a bankruptcy liquidation proceeding, in the following order.  *First*, labor-related claims up to an amount equivalent to 150 times the Brazilian monthly minimum wages per creditor and all occupational claims.  *Second*, secured claims up to the value of the assets encumbered in connection with such claims.  *Third*, tax claims exclusive of tax fines.  *Fourth*, unsecured claims.  *Fifth*, penalties and fines in connection with criminal or administrative law breaches, including tax fines.  *Sixth*, claims subordinated by law or contract and those claims held by directors and shareholders not employed by the debtor.  *Seventh*, interest on a debt accrued after commencement of a

liquidation proceeding to be paid pursuant to the same priority waterfall for the respective principal debt amount.

50.     In a Judicial Reorganization, the claims of affected creditors are paid according to the plan of reorganization.  The plan of reorganization, however, (i) may not provide a period longer than three (3) years for the payment of labor-related claims upon approval (the payment of labor-related claims of a strictly salary nature, up to the limit of five (5) monthly minimum wages per worker, must be paid within thirty (30) days); and (ii) may not provide for the suppression or the replacement of any security interest, when the asset covered by such security interest is disposed of, without the express approval of the relevant secured creditor.  The law provides for four (4) classes in a judicial reorganization: (i) labor creditors limited to 150 minimum wages, with any excess classified along with unsecured creditors, (ii) secured creditors, (iii) unsecured creditors, and (iv) small and micro-enterprises.

## THE CHAPTER 15 DEBTOR'S REORGANIZATION AND BRAZILIAN RJ PROCEEDING

### A.  Chapter 15 Debtor's Financial Distress and Commencement of the Brazilian RJ Proceeding

51.     Light, with its concessionaries Light Serviços de Eletricidade S.A ("**Light SESA**") and Light Energia S.A. ("**Light Energia**," together with Light and Light SESA, the "**Light Group**"), is a publicly-held conglomerate that focuses on the generation and distribution of electric power in Rio de Janeiro, Brazil.  The Chapter 15 Debtor is the holding company of the Light Group, where Light SESA and Light Energia are counterparties to two concession agreements: (i) concession agreement No. 001/96 owned by Light SESA for the transmission and distribution of energy sources; and (ii) concession agreement No. 005/2017 owned by Light Energia for the generation of electricity.  The Chapter 15 Debtor owns 100% of the equity interests in both Light SESA and Light Energia.  To the best of my knowledge, the financial obligations co-owed by the Chapter 15 Debtor and each of Light SESA and Light

Energia are the only claims subject to the Brazilian RJ Proceeding.  However, under Brazilian law, the mentioned concessionaires are not subject to the judicial reorganization regime, but in this particular case, they are protected by the Code of Civil Procedure due to their joint debt with Light S.A. - Em Recuperação Judicial.

52.     In recent years, the Light Group has suffered deteriorating financial conditions with rapidly depleting cash reserves.  Considering such declining financial situation, on April 10, 2023, the Chapter 15 Debtor, together with certain of its affiliates, including Light SESA and Light Energia, filed a request for a preliminary protective injunction in front of the Bankruptcy Court.  On April 12, 2023, the Bankruptcy Court issued an order granting the preliminary injunction, suspending the enforcement of any financial obligations, acceleration of any indebtedness or early maturity of the debts temporarily, and ordered the parties to engage in negotiations to reach a restructuring agreement or an alternative repayment plan for the debts.  However, the Light Group was not able to reach any agreement with the various lender parties.

53.     On May 12, 2023, Light filed an RJ petition and commenced the Brazilian RJ Proceeding, seeking to reorganize its debt under the Brazilian Bankruptcy Law while preserving its ongoing business and operations (the **RJ Petition**).  A copy of the RJ Petition and its certified English translation is attached hereto as **Exhibit A**.[14]

54.     On May 15, 2023, the Bankruptcy Court entered an order accepting the Chapter 15 Debtor into Judicial Reorganization (the "**Brazilian Acceptance Order**").  A copy of the Brazilian Acceptance Order and its certified English translation is attached hereto as **Exhibit B**.  Pursuant to the Bankruptcy Law, upon the entry of the Brazilian Acceptance Order, an RJ

---

[14]     As described above, Light SESA and Light Energia, the operating entities of the Light Group, are electric energy services providers and, as such, are ineligible to file for an RJ petition.  In the RJ Petition, therefore, the Chapter 15 Debtor requested an extension of the RJ Stay to Light SESA and Light Energia to ensure that the Light Group's operations were preserved.

Stay was imposed on Light, suspending all acceleration provisions in Light's debt documents, and enjoining all actions against Light for a period of 180 days in Brazil.[15]  In addition, the Brazilian RJ Court named Licks Contadores Associados as judicial administrators for the case.[16]

## B. Negotiation of Brazilian RJ Plan, Scheduling of GCM, and Confirmation of Brazilian RJ Plan

55.     On July 14, 2023, the Chapter 15 Debtor introduced an initial proposal for its *plano de recuperação judicial* (RJ plan) to establish the terms and conditions relating to the main measure that may be adopted in order to overcome the Chapter 15 Debtor's current economic and financial situation and its impact on the Light Group.  Certain creditors expressed their dissatisfaction with the RJ plan.   Creditors then engaged in discussions with the Company's largest shareholder to negotiate amended terms of the RJ plan.

56.     While negotiations with creditors regarding the terms of the RJ plan were ongoing, on October 1, 2023, Light Energia petitioned the Brazilian Court to allow a partial withdrawal from the RJ Stay due to progress in extrajudicial negotiations with certain creditors and other stakeholders.  On October 9, 2023, Light requested a 180-day extension of the RJ Stay with respect to itself and Light SESA until April 17, 2024 to finalize its ongoing restructuring negotiations with creditors, which the Brazilian RJ Court granted the following day.  In its order, the Brazilian RJ Court also instructed the Judicial Administrators to convene a GCM to deliberate on the RJ plan amidst multiple creditor-led objections to the proposal.

---

[15]    In addition, the Brazilian RJ Court granted the extension of the stay to the non-debtor affiliates, Light SESA and Light Energia until the confirmation of a reorganization plan.  The Bankruptcy Court acknowledged that Light is a co-obligor under certain financial debts incurred by Light SESA and Light Energia, and that an extension of the RJ Stay is necessary because any creditor actions against them will have a direct impact on Light, as the holding company and obligor for their debts.  The extension of the stay allows the Light Group to continue fulfilling its concession obligations for the public interest while restructuring its financial obligations in the reorganization proceeding.  Other than the RJ Stay, the Brazilian RJ Proceeding does not affect other aspects related to the claims against Light SESA and Light Energia.

[16]    Given the complexity of the legal matters involved in the Brazilian RJ Proceeding, on September 19, 2023, the Brazilian RJ Court appointed Luciano Bandeira Advogados Associados as an additional judicial administrator alongside Licks Contadores Associados (together, the "**Joint Administrators**").   Appointment of Luciano Bandeira Advogados Associados as a Judicial Administrator was confirmed on September 26, 2023.

Subsequently, the Judicial Administrators announced the dates for the GCM and set March 21, 2024 as the first call and March 28, 2024 as the second call.[17]

57.    On February 23, 2024, Light released an updated version of the RJ plan proposal.  While the amended RJ plan had the approval of Light's board of directors and was developed with a view toward a consensual resolution with the Company's creditors and stakeholders, certain debenture holders remained unsatisfied with the revised terms.  Given the status of the negotiations, the Brazilian RJ Court agreed to postpone the GCM to April 25, 2024 for the first call and May 3, 2024 for the second call.  On April 19, 2024, the Brazilian RJ Court also granted a further 90-day extension of the RJ Stay with respect to Light and Light SESA until July 8, 2024.

58.    On April 11, 2024, Light released a term sheet that was agreed upon with an ad hoc group of Brazilian debenture holders, and on April 22, 2024, such parties executed a restructuring support agreement (the "**Brazilian RSA**").  Light also presented an amended version of the RJ plan that contemplated a capital increase from Light's anchor shareholders, capitalization of specific claims via convertible and non-convertible debt instruments, and full payment to creditors whose claims as of May 12, 2023 amounted to up to R$30,000 (approximately US$5,820).

59.    At the April 25, 2024 GCM, creditors voted to postpone the GCM to May 29, 2024 to provide additional time to review the terms of the RJ plan.

60.    On May 18, 2024, Light presented the final version of the RJ plan (the "**Brazilian RJ Plan**") ahead of the GCM to be held on May 29, 2024.  A copy of the Brazilian RJ Plan and its certified English translation is attached hereto as **Exhibit C**.

---

[17]    Pursuant to the Brazilian Bankruptcy Law, if creditors holding more than 50% of the claims subject to the Brazilian RJ Proceeding appeared at the first call of the meeting, then the GCM would proceed on that date.  If not, then the GCM would proceed on the second call date.

61.     At the GCM on May 29, 2024, creditors representing 99.1% in amount and 99.4% of the total headcount present at the meeting, including 51% of the Existing Noteholders, voted to approve the Brazilian RJ Plan, satisfying the minimum approval thresholds required under the Brazilian Bankruptcy Law.  Holders of (i) 4.375% Notes due 2026 and issued by Light SESA (the "**Light SESA Notes**") in the principal amount of US$400,000,000, and (ii) 4.375% Notes due 2026 issued by Light Energia S.A. (the "**Light Energia Notes**," and together with the Light SESA Notes, the "**Existing Notes**," such holders of which, the "**Existing Noteholders**") were allowed to either (i) direct the Indenture Trustee to cast votes on their behalf at the GCM or (ii) follow the process authorized by the Brazilian RJ Court to individualize their claims in the creditor matrix and participate and vote directly and independently at the GCM.

62.     As reflected throughout the Brazilian RJ Proceeding, the Chapter 15 Debtor's creditors wherever they reside, including the Existing Noteholders, were provided with the opportunity to participate in the plan of reorganization discussions in accordance with the Brazilian Bankruptcy Law.  The Brazilian RJ Plan and voting procedures apply uniformly to all of the Chapter 15 Debtor's creditors.[18]

63.     Following creditor approval of the Brazilian RJ Plan at the GCM, the Judicial Administrators prepared a report summarizing the process and outcome of the GCM and tabulation of the votes, which was made public through the Brazilian Court's website.  Copies of the Judicial Administrators' report and Minutes of the GCM and their certified English translations are attached hereto as **Exhibit D**.  While some parties challenged the Brazilian RJ Plan, both the Judicial Administrators and the Public Prosecutor issued opinions in favor of the confirmation of the Brazilian RJ Plan.

---

[18]   The Brazilian Bankruptcy Law requires that all creditors whose claims are impaired under an RJ plan be permitted to vote.

64.     On June 18, 2024, 2024, the Brazilian Court found that the Chapter 15 Debtor had satisfied all the requirements under the Brazilian Bankruptcy Law, and entered an order (i) finding that the Chapter 15 Debtor had met all the procedural requirements under the Brazilian Bankruptcy Law, (ii) finding the requisite creditor majorities for plan approval had been met, and (iii) confirming the Brazilian RJ Plan (as may be modified pursuant to Brazilian law and in accordance therewith, the "**Brazilian Confirmation Order**"), overruling all challenges and objection to the Brazilian RJ Plan.  A copy of the Brazilian Confirmation Order and its certified English translation is attached hereto as **Exhibit E**.  The Brazilian Confirmation Order was published in the Official Gazette on June 20, 2024.

65.     On June 25, 2024, creditor Banco do Brasil filed a motion with the Brazilian RJ Court challenging certain provisions of the Brazilian RJ Plan and seeking a nullification of the Brazilian Confirmation Order. It also filed an interlocutory appeal with the 12th Chamber of Private Law.  As of the date of this Declaration, Banco do Brasil's motion is pending judicial decision.

66.     Consistent with the description of RJ proceedings above, throughout the Brazilian RJ Proceeding, creditors and other parties in interest received notice through electronic publication on the Brazilian RJ Court's website of all notices and orders, including when the Chapter 15 Debtor presented its Brazilian RJ Plan and when the Brazilian Court scheduled the GCM to vote on the Brazilian RJ Plan.  Creditors and parties in interest received additional notice of material orders and notices entered by the Brazilian Court through electronic publication in the Official Gazette.  The Public Prosecutor and the Judicial Administrators also diligently represented the interests of all creditors and the legality of the proceedings throughout the Brazilian Proceeding.  Further, the Light Group and the Judicial Administrators published relevant notices and documents on the Company's and Judicial

Administrators' websites, respectively, and provided information to creditors to enable them to participate in the Brazilian Proceeding.

67.     The Brazilian Proceeding was orderly and fair, as it provided for extensive procedural protections for creditors, and assured a court-supervised restructuring in Brazil. Creditors have actively exercised their due process rights in Brazil in connection with the proposal, negotiation, and implementation of the Brazilian RJ Plan.  Throughout the Brazilian Proceeding, creditors have filed proofs of claim with the court-appointed Judicial Administrators seeking to have their claims included or adjusted for purposes of voting on and receiving distributions under the Brazilian RJ Plan.  The Judicial Administrators subsequently updated the creditor matrix, and creditors received notice through the Official Gazette, thereby allowing parties to present new proofs of claim before the Brazilian Court within the statutory deadline. In addition, individual creditors have actively sought information from the Chapter 15 Debtor to advance their plan negotiations. Several creditors also filed objections to the RJ plan proposals.

**C.  Key Terms of Brazilian RJ Plan**

68.     The confirmed Brazilian RJ Plan is consistent with the terms of the Brazilian RSA, Noteholder RSA, and Noteholder Term Sheet and provides for the repayment to creditors, including creditors located in the United States, such as many of the Existing Noteholders.  The Brazilian RJ Plan is premised on the issuance of convertible and non-convertible securities (the "**New Securities**") that may governed by either Brazilian or New York law (such New York law-governed New Securities, the "**Exempt Securities**"), as well as a capital increase ranging from R$1 billion (US$194 million) to R$1.5 billion  (the "**Capital Raise**"), with up to R$1 billion of that new capital committed by a certain anchor shareholder, Bavaro Fundo de Investimento em Acoes.

69.     The Brazilian RJ Plan provided creditors with several options for the payment of their affected claims.  Option 1 will allow creditors to exchange no less than 35% of their Light SESA Claims into convertible instruments of the Chapter 15 Debtor, up to a total amount of R$2.2 billion (the "**Required Conversion Amount**").[19]  Brazilian RJ Plan § 6.1.1.2.  The equitized claims will be exchanged for new convertible securities to be issued by the Chapter 15 Debtor (the "**New Convertible Securities**").  Brazilian RJ Plan § 6.1.1.3.  The New Convertible Securities will be mandatorily converted into equity ninety (90) days after Light SESA obtains the renewal of its concession with ANEEL (the "**Concession Renewal**"), provided that the Capital Raise also occurs.  Brazilian RJ Plan § 6.1.1.3.2.  The remainder of the Light SESA Claims that are not converted will be exchanged for new priority securities to be issued by Light SESA and guaranteed by the Chapter 15 Debtor pursuant to the Brazilian RJ Plan (the "**New Priority Light SESA Securities**"), up to R$4.1 billion (the "**New Priority Securities Cap**").[20]  Brazilian RJ Plan § 6.1.1.2.  The New Priority Light SESA Securities will receive a first-priority lien on certain assets of Light SESA and will be paid in ten (10) equal semi-annual installments starting forty-two (42) months after the closing date of the RJ Plan (the "**Closing Date**").  Brazilian RJ Plan § 6.1.1.6(b).  Interest will accrue on the New Priority Light SESA Securities at a rate of 4.21% per annum[21] and be paid semi-annually, starting 6 months after the Closing Date.  Brazilian RJ Plan § 6.1.1.6(c).

70.     Alternatively, Option 2 is available to creditors who do not wish to equitize their Light SESA Claims, which will allow creditors to exchange their Light SESA Claims in a dollar-for-dollar basis for new securities issued by Light SESA and guaranteed by the Chapter

---

[19]   To the extent the total amount of claims to be converted by creditors choosing Option 1 exceeds the Required Conversion Amount, the excess amount will be reduced pro rata between all converting creditors.

[20]   If the total amount of Light SESA claims to be exchanged for New Priority Light SESA Securities exceeds the New Priorities Securities Cap, the excess claims will be exchanged for New Light SESA Securities (as defined above) instead.

[21]   The interest rate of 4.21% per annum shall apply with respect to New Priority Light SESA Securities governed by New York law.

15 Debtor (the "**New Light SESA Securities**").[22]  Brazilian RJ Plan § 6.1.2.  Any claims in excess of Option 1 thresholds shall be allocated in Option 2.  The New Light SESA Securities will receive a second-priority lien on the same collateral of the New Priority Light SESA Securities and will be paid in twenty (20) semi-annual installments starting forty-two (42) months after the Closing Date.  Brazilian RJ Plan § 6.1.2.2(a).  Interest will accrue at a rate or 2.26% per annum[23] and will be paid semi-annually starting eighteen (18) months after the Closing Date.  Brazilian RJ Plan § 6.1.2.2(b).  To the extent the total amount of claims subject to Option 1 exceed the New Priority Securities Cap, the excess amounts will be paid to creditors under Option 2.

71.      Under both Option 1 and Option 2, claims held by creditors against Light Energia (the "**Light Energia Claims**") will be exchanged for new securities with substantially similar terms to the current Light Energia Notes, but no longer guaranteed by the Chapter 15 Debtor (the "**New Light Energia Securities**").  In addition, creditors holding Light Energia Notes will be allowed to participate in a reverse auction, under which creditors who submit winning bids will receive an early repayment in cash for the total amount or a portion of their Light Energia Notes up to the maximum amount of R$500 million.  Brazilian RJ Plan § 6.1.5(v).  The New Light Energia Securities will be fully decoupled from the new securities to be issued by Light SESA.  Brazilian RJ Plan § 6.1.5(v).  Creditors holding New Light Energia Securities will also be given the opportunity to participate in a reverse auction, whereby such creditors may opt to receive an early cash redemption of their Light Energia Claims at a discount, starting with a 5% minimum bid.  Light Energia will pay cash out starting with the lowest bidders, up to a maximum total amount of R$500 million.  Brazilian RJ Plan § 6.1.5(v).

---

[22]    If the total amount of claims to be converted under Option 1 does not reach the Required Conversion Amount, the difference will be reduced, pro rata amongst all creditors, from the total amount of New Light SESA Securities to be issued by Light SESA.

[23]    The interest rate of 2.26% per annum shall apply with respect to New Light SESA Securities governed by New York law.

72.     To select either Option 1 or Option 2, creditors must agree to certain conditions under the Brazilian RJ Plan, among which is compliance with a commitment to not litigate against the Light Group, pursuant to Section 10.4 of the Brazilian RJ Plan.  Brazilian RJ Plan § 10.4.

73.     The RJ Plan provided that local unsecured creditors with up to R$30,000 in credits would be repaid in full, without any adjustment.  Brazilian RJ Plan § 6.1.3.

74.     Financial creditors, including banks holding certain Light SESA Claims that comply with the non-litigation commitment provision in the Brazilian RJ Plan will have the right to elect to be repaid with specific non-convertible securities for up to R$670 million. Brazilian RJ Plan § 6.1.3.  Such creditors must commit to providing, upon request from Light, Light SESA or Light Energia, currency and/or interest rate derivative lines with a notional value equal to or greater than their respective unsecured claims for a minimum period of three-hundred and sixty-five (365) days.  Brazilian RJ Plan § 6.1.4.1.

75.     Finally, creditors who do not affirmatively elect any of the payment options or meet certain conditions under the Brazilian RJ Plan shall receive their recoveries pursuant to the default treatment terms and conditions (the "**Default Treatment**").  Brazilian RJ Plan § 6.1.7.  Pursuant to the Default Treatment, both the Light SESA Claims and the Light Energia Claims will be exchanged by restructured claims under the Brazilian RJ Plan, pursuant to new securities to be issued by the Chapter 15 Debtor, with an 80% haircut and due fifteen (15) years after the closing date under the Brazilian RJ Plan.[24]

**D.  Implementation of the Brazilian RJ Plan and Brazilian Confirmation Order**

76.     The Brazilian Confirmation Order and Brazilian RJ Plan are in full force and effect and have not been stayed by any court.

---

[24]   Restructured Light SESA Claims denominated in Brazilian Reais will accrue interest pursuant to the Brazilian index IPCA, payable at maturity, whereas other restructured claims denominated in US$ will not accrue interest.

77.     Pursuant to the Brazilian RJ Plan, the Light Group and Ad Hoc Group agreed to amend the governing law of Existing Notes issued by the Light Group from New York law to U.K. law.  I understand that after implementation of the Brazilian RJ Plan and the execution of the Existing Notes amendment, the Chapter 15 Debtor commenced the English Scheme pursuant to the English Companies Act in the English Court.

*[Remainder of Page Intentionally Left Blank]*

I certify under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States that the foregoing is true and correct.

Executed on October 15, 2024 in State of Rio de Janeiro, Brazil.

Respectfully submitted,

*/s/ Luiz Roberto Ayoub*
Luiz Roberto Ayoub